**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **CRIMINAL NO. DKC-12-086** |
| **SAMUEL BRAXTON,** | |
| **Petitioner** | |

## GOVERNMENT'S RESPONSE IN OPPOSITION TO
## PETITIONER'S MOTION FOR A REDUCED SENTENCE

Mr. Braxton has filed a motion for a reduced sentence pursuant to 18 U.S.C. § 3582(c)(1)(A). The motion should be denied because he has not shown extraordinary and compelling reasons and an analysis of the factors under 18 U.S.C. § 3533(a) does not warrant a reduction of his sentence.

### Factual and Procedural Background

Between June 2010 and February 2012, Mr. Braxton was part of a drug trafficking conspiracy, along with ten co-conspirators, during which Mr. Braxton regularly received multi-ounce to gallon quantities of a mixture or substance containing a detectable amount of PCP. ECF No. 211-1. Mr. Braxton would then add starter fluid or other chemicals to the PCP to increase its quantity. *Id.* Also, during this time period, Mr. Braxton received multi-ounce quantities of heroin. *Id.* Mr. Braxton also received cocaine hydrochloride and crack from various sources of supply and would convert a portion of the cocaine hydrochloride into crack. *Id.* Mr. Braxton then sold that PCP, heroin, and crack to regular drug customers in Prince George's County, Maryland, and elsewhere in the Washington, D.C. metropolitan area. *Id.*

From November 2011 through January 2012, the United States District Court for the District of Maryland authorized wire interceptions on Mr. Braxton's cellular telephone. *Id.* During

that time, Mr. Braxton was intercepted on over 600 drug-related telephone conversations during which he and other co-conspirators discussed the sale of and arranged drug transactions involving PCP, heroin, crack, cocaine, and marijuana. *Id.*

On December 22, 2011, Mr. Braxton was overheard on wire interception directing his minor son to transport a bag containing PCP from Mr. Braxton's bowling alley locker. *Id.* Specifically, Mr. Braxton said, "Just put it in my locker, 109, don't let nobody see you do it, hold up, don't let nobody see you put it in there ok...Go check my locker cause the last time I had you at my locker, I went right there and opened it up because you didn't push the key." *Id.* That same day, agents observed Mr. Braxton's minor son exiting Mr. Braxton's vehicle, entering AMF Marlow Heights Lanes bowling alley, exiting a short time later, and re-entering Mr. Braxton's vehicle. *Id.* On another occasion during the time of the conspiracy, a witness observed Mr. Braxton, at the AMF Marlow Heights bowling alley, place bottles of PCP in his minor son's lunch box and direct his son to bring the lunch box to Mr. Braxton's apartment. *Id.*

On February 23, 2012, law enforcement seized approximately 16 ounces of PCP that were owned by Mr. Braxton during the execution of a search warrant and also seized approximately eight ounces PCP from Mr. Braxton's bowling alley locker (number 109) located at AMF Marlow Heights Lanes in Temple Hills, Maryland. *Id.*

On September 24, 2012, Mr. Braxton entered a guilty plea to conspiracy to distribute and possess with intent to distribute, (i) one kilogram or more of a mixture and substance containing a detectable amount of phencyclidine, (ii) 28 grams or more of a mixture and substance containing a detectable amount of cocaine base, and (iii) a mixture and substance containing a measurable amount of heroin, in violation of 21 U.S.C. § 841(a)(1) (Count One). ECF No. 210. In exchange for his guilty plea, the Government agreed not to file a notice of Mr. Braxton's two prior drug

convictions pursuant to 21 U.S.C. § 851, which would have mandated a life sentence.  ECF No. 211.

On April 1, 2013, Judge Titus sentenced Mr. Braxton to 324 months' imprisonment followed by a five-year term of supervised release.  ECF No. 305.  On May 15, 2017, Judge Titus granted a motion to reduce sentence and Mr. Braxton's term of imprisonment was thus reduced to 291 months.  ECF No. 492, 493.

On October 13, 2020, Mr. Braxton previously sought compassionate release as described further below, and which was denied.  ECF Nos. 580, 598.  Mr. Braxton has now filed a successive motion for compassionate release, based partially on similar arguments to his first, and now seeks a sentence reduction to 188 months.

**Argument**

**A.    Legal Framework**

Under 18 U.S.C. § 3582(b), the district court has only limited authority to modify a final sentence.  *Dillon v. United States*, 560 U.S. 817, 824-25 (2010) (noting that under Section 3582, the Court generally "may not modify a term of imprisonment once it has been imposed"); *United States v. Goodwyn*, 596 F.3d 233, 235 (4th Cir. 2010) ("The law closely guards the finality of criminal sentences against judicial change of heart") (internal quotation omitted); *United States v. Brown*, 2020 U.S. Dist. LEXIS 52079, RDB-16-553, at 2 (D. Md. Mar. 26, 2020) (holding that the Court "may not modify the sentence imposed . . . unless certain limited circumstances arise or as permitted under Rule 35 of the Federal Rules of Criminal Procedure and 18 U.S.C. § 3582(c)").  Section 3582(c)(1)(A)(i), commonly termed the "compassionate release" provision, provides one such exception by permitting courts to reduce a previously imposed term of imprisonment upon finding that "extraordinary and compelling reasons" exist for doing so, consistent with the applicable policy statements of the Sentencing Commission.

As this Court is aware, the First Step Act of 2018, Pub. L. 115-391, 132 Stat. 5194, established significant changes to the procedures involving compassionate release from federal prison.  Prior to the passage of the First Step Act, 18 U.S.C. § 3582(c)(1)(A)(i) provided the Bureau of Prisons ("BOP") with sole discretion to file compassionate release motions with district courts. With the passage of the First Step Act, defendants may now petition federal courts directly for compassionate release whenever "extraordinary and compelling reasons" warrant a reduction in sentence.  The Act permits a defendant to seek a sentence reduction after he "has fully exhausted all administrative rights to appeal a failure of the [BOP] to bring a motion on the Defendant's behalf or the lapse of 30 days from the receipt of such a request by the warden of the defendant's facility, whichever is earlier."  18 U.S.C. § 3582(c)(1)(A).  Once these mandatory conditions are satisfied, this Court may authorize compassionate release upon a showing of "extraordinary and compelling reasons" and after weighing the factors presented in 18 U.S.C. § 3553(a).  18 U.S.C. § 3582(c)(1)(A)(i).

The United States Sentencing Commission is charged with defining "what should be considered extraordinary and compelling reasons for sentence reduction" under § 3582(c)(1)(A). 28 U.S.C. § 994(t).  Additionally, the Sentencing Commission has authorized the BOP to identify extraordinary and compelling reasons "other than, or in combination with" the reasons identified by the Commission.  *Id.* § 1B1.13 cmt. n.1(D).

Although potentially useful guides, neither the Sentencing Commission's guidelines nor the BOP's regulations now constrains this Court's analysis and "district courts are 'empowered . . . to consider *any* extraordinary and compelling reason for release that a defendant might raise.'" *United States v. McCoy*, 981 F.3d 271, 284 (4th Cir. 2020) (quoting *United States v. Zullo*, 976 F.3d 228, 230 (2d Cir. 2020)).

In *McCoy*, the Fourth Circuit affirmed four district court orders granting the motions for reduction of sentence under § 3582(c)(1)(A) of four individual defendants and reducing their sentences to time served. *Id.* at 288. Each defendant had been convicted of multiple violations of 18 U.S.C. § 924(c) associated with their convictions for robbery. At the time of their sentencings, sentences under § 924(c) were "stacked," or imposed consecutively on each other, resulting in mandatory minimums for the defendants ranging from thirty-five to fifty-three years of imprisonment. Because the First Step Act ended the practice of stacking § 924(c) convictions, were the defendants resentenced today, their sentences would have been dramatically shorter— thirty years shorter for three of the defendants and 200 months shorter for one. *Id.* at 285.

After determining that the district courts possessed the discretion to consider "any extraordinary and compelling reason for release that a defendant might raise," *id.* at 284, the Fourth Circuit held that in considering whether the sentencing disparities met that standard, the district courts had appropriately considered "two distinct features" of the defendants' § 924(c) sentences, *id.* at 285. First, the sentences were unusually and grossly lengthy in comparison to more serious offenses, including murder, and were driven almost entirely by § 924(c) stacking. *Id.* Second, the sentences were grossly disproportionate to sentences imposed today under § 924(c) due to intervening changes in the law. *Id.* at 285–86. Additionally, the court noted that the district courts' decisions were the product of an "individualized assessment" of each defendant's sentence that also took into consideration the significant sentences they already had served, their relative youth at the time of the offenses, and their "excellent institutional records" and "substantial steps toward rehabilitation." *Id.* at 286.

Reading *McCoy* too broadly effectively perverts the entire foundation for the well-grounded concept of the finality of sentencing. *Goodwyn*, 596 F.3d at 235. In fact, it stands

to effectively create a continuously operational Ferris wheel of resentencings, resulting in a regimen that continually reassesses and alters the sentences of others whenever a co-defendant's sentence is lowered, or the law changes, or for whatever reason a defendant can ask a court to consider. In fact, such a broad application of extraordinary and compelling reasons would set up the very "Wild West" scenario that Judge Easterbrook of the Seventh Circuit decried in his recent holding in *United States v. Gunn*, 980 F.3d 1178, 1180 (7th Cir. 2020).

This Court should refuse to read *McCoy* too broadly and should limit its application to its facts. Instead, this Court should adhere to the "working definition" of compassionate release—related to health, age, and familial circumstances—and not stray far from the categories explicitly listed in the policy statement, even if it is not binding. "Failing to heed those broad categories as guideposts would turn the compassionate release framework into a mechanism by which a court could simply reduce any sentence it disagrees with for any reason it concludes is extraordinary without respect to the Commission's guidance." *See United States v. Crandall*, 2020 WL 7080309, at *6 (N.D. Iowa Dec. 3, 2020) (Williams, J.). To do otherwise risks creating the "idiosyncratic release policy" that would surely set the stage for a "Wild West" of compassionate release. *Gunn*, 980 F.3d at 1180.

The burden is on the inmate to demonstrate that he has exhausted administrative remedies and that there are extraordinary and compelling reasons to reduce his sentence. 18 U.S.C. § 3582(c)(1)(A); *United States v. Greenhut*, 2020 WL 509385, at *1 (C.D. Cal. Jan. 31, 2020); *United States v. Hamilton*, 715 F.3d 328, 337 (11th Cir. 2013) (holding that an inmate, "as the § 3582(c)(2) movant, bears the burden of establishing" eligibility). Even for those inmates who are statutorily eligible for a reduced sentence, compassionate release is a "rare" and "extraordinary" remedy. *United States v. Chambliss*, 948 F.3d 691, 693-94 (5th Cir. 2020); *White*

5

*v. United States*, 378 F. Supp. 3d 784, 787 (W.D. Mo. 2019) (holding that "a compassionate release . . . is an extraordinary and rare event."); *United States v. Mangarella*, 2020 WL 1291835, at *2-3 (W.D.N.C. Mar. 16, 2020).

And of course, even where a defendant can establish "extraordinary and compelling" reasons justifying compassionate release, relief is not automatic.  Instead, the defendant must further demonstrate (1) that he would not be a danger to the community and (2) that the proposed reduction would be consistent with the factors set forth in 18 U.S.C. § 3553(a).  *See United States v. Guadagnoli*, No. DKC-13-0363 (D. Md. July 19, 2021), ECF 107 at 4 ("because the COVID pandemic and his underlying health conditions make him eligible for consideration, it is appropriate to consider and balance the sentencing factors.").

### B.    Mr. Braxton has Exhausted Administrative Remedies

Before a court is authorized to consider a § 3582 motion, the statute requires a defendant to pursue administrative remedies with BOP by first presenting the request to his warden.  *E.g.*, *United States v. Keller*, 2 F.4th 1278, 1282 (9th Cir. 2021) ("Joining the unanimous consensus of our sister circuits, we hold that § 3582(c)(1)(A)'s administrative exhaustion requirement imposes a mandatory claim-processing rule that must be enforced when properly invoked."); *United States v. Raia*, 954 F.3d 594, 597 (3d Cir. 2020); *United States v. Underwood*, 2020 WL 1820092, at *2 (D. Md. Apr. 10, 2020); *accord* ECF 61 at 14.  Only when a defendant has fully exhausted his administrative rights to appeal the BOP's failure to bring the motion on his behalf—or where it has been more than 30 days since the warden received the defendant's request, whichever is earlier—does the statute confer authority on a court to consider the merits of a § 3582 motion.  *See, e.g.*, *Raia*, 954 F.3d at 597; *Underwood*, 2020 WL 1820092, at *2.  The exhaustion requirement applies with equal force to any successive motion for release.  *See, e.g.*, *United States v. Sparrow*, 837 F. App'x 932, 934 (3d Cir. 2021) ("To the extent the circumstances have changed, Sparrow

should pursue his administrative remedies. The Warden would then have the opportunity to address all of the current circumstances surrounding his request for release." (citing *Raia*, 954 F.3d at 597)); *United States v. Cain*, 2021 WL 388436, at *4 (D. Me. Feb. 3, 2021) ("Successive compassionate release motions must independently satisfy the exhaustion requirement. . . . Even though Mr. Cain made a similar request for release in August 2020, these factors may well have changed in the ensuing months and the statute contemplates that the warden be given an opportunity to make an internal assessment based on then current conditions."); *United States v. Goodwin*, 2020 WL 7316110, at *2 (E.D. Mich. Dec. 10, 2020); *United States v. Iwai*, 2020 WL 6470167, at *3 (D. Haw. Nov. 3, 2020) (recognizing that an inmate may present successive motion based on changed circumstances, but holding that, "for each compassionate release motion an inmate brings, he must first petition the warden of his facility and then meet one of the two exhaustion methods detailed in Section 3582(c)(1)(A)").

Here, Mr. Braxton has provided an exhibit showing that he filed for administrative relief on October 4, 2021. ECF No. 617, Ex. E. Because more than 30 days have passed since that letter was filed, the Government concedes that he has exhausted administrative remedies as required by 18 U.S.C. § 3582(c)(1)(A).

**C.    Petitioner does not present extraordinary and compelling reasons for compassionate release.**

The suggested extraordinary and compelling reasons for compassionate release are, (i) the disparity between the sentence Mr. Braxton is currently serving and the shorter guidelines that would be applicable today, (ii) the fact that he would not qualify as a career offender today and the resultant unwarranted sentencing disparities between himself and other co-defendants, and (iii) the sentence he would receive today would likely be lower. The Government respectfully submits

that these are insufficient to satisfy the substantial burden of showing extraordinary and compelling circumstances for the rare and extraordinary remedy of compassionate release.

As stated above, *McCoy* itself was actually limited in scope. *See* 981 F.3d at 287 (supporting only "the provision of individual relief in the most grievous cases" but not "automatic vacatur and resentencing of an entire class of sentences"). And reading *McCoy* too broadly subverts the entire foundation for the well-grounded concept of the finality of sentencing. *Goodwyn*, 596 F.3d at 235 ("The law closely guards the finality of criminal sentences against judicial change of heart") (internal quotation omitted).

And *McCoy* itself is a decision not without controversy among the Circuits.[1] Thus, the mere fact that Petitioner asserts that there is a disparity between the sentence he is currently serving and the sentence he believes he would receive today should not constitute extraordinary and compelling reasons for compassionate release. Any court that relies on *McCoy* in considering a request for compassionate release should not simply grant it indiscriminately to any claim of an alleged sentencing disparity. In the first instance, the *McCoy* decision, as noted above, was applied only to stacked 924(c) convictions, and was not so broad as to automatically permit what Petitioner

---

[1]    In fact, the Eleventh Circuit recently disagreed with *McCoy* in *United States v. Bryant*, 2021 WL 1827158 (11th Cir. May 7, 2021). There, the court agreed with the Government that a defendant could not obtain relief based on the length of stacked section 924(c) sentences that would not be imposed under current law. The Court stated in part: "[f]inality is 'essential to the operation of our criminal justice system.'" *Teague v. Lane*, 489 U.S. 288, 309 (1989). "Deterrence depends upon [it.] … Rehabilitation demands [it.] … [And it] benefits the victim by helping [her] put the trauma of the crime and prosecution behind [her]." *Patterson v. Sec'y, Fla. Dep't of Corr.*, 849 F.3d 1321, 1325 (11th Cir. 2017). *See* 2021 WL 1827158 *12. Noting that it would not replace the phrase "[a]s determined by the Director of the [BOP]" with "as determined by a district court," the Eleventh Circuit analyzed the history of § 3582 and applicable policy statements, and concluded in part that "district courts are bound by the Commission's definition of "extraordinary and compelling reasons" found in 1B1.13 because, under our understanding of the statute, Congress said they are." *Id.* at *38.

seeks in this instance. In fact, such a broad application of extraordinary and compelling reasons would unleash the very "Wild West" scenario that Judge Easterbrook of the Seventh Circuit decried in his recent holding in *United States v. Gunn*:

> [W]e do not see the absence of an applicable policy statement as creating a sort of Wild West in court, with every district judge having an idiosyncratic release policy … The statute itself sets the standard: only "extraordinary and compelling reasons" justify the release of a prisoner who is outside the scope of § 3582(c)(1)(A)(ii). The substantive aspects of the Sentencing Commission's analysis in § 1B1.13 and its Application Notes provide a working definition of "extraordinary and compelling reasons"; a judge who strikes off on a different path risks an appellate holding that judicial discretion has been abused. In this way the Commission's analysis can guide discretion without being conclusive. *Cf. Gall v. United States*, 552 U.S. 38, 49-50 (2007); *Kimbrough v. United States*, 552 U.S. 85 (2007).

980 F.3d 1178, 1180 (7th Cir. 2020). Reducing Mr. Braxton's sentence could spur a chain reaction of those co-defendants who remain incarcerated filing their own motions claiming that Mr. Braxton's reduction in sentence is now an extraordinary and compelling reason for their own compassionate release.

Judges in this District are not merely throwing caution to the wind and granting compassionate release for any sentencing disparity, despite *McCoy*. Judge Gallagher recently noted the following in denying compassionate release based on claimed sentencing disparities that resulted in part from changes in the career offender law:

> Brice argues, in the alternative, that this Court should consider the length of his sentence, which he contends is longer than that he would receive if sentenced today … As background, Brice is correct that, as a result of a decision issued by the United States Court of Appeals for the Fourth Circuit, he would not be a career offender if he were sentenced today. In *United States v. Norman*, 935 F.3d 232, 237–39 (4th Cir. 2019), the Fourth Circuit decided that conspiracy to distribute narcotics did not constitute a "controlled substance offense" for purposes of qualifying for career offender treatment. Thus, if Brice were to be sentenced today after *Norman* and certain intervening changes to the sentencing guidelines, his advisory

> guideline range would likely be meaningfully lower.  However, the
> First Step Act did not expressly change the law in any way that
> would modify Brice's sentence, and it did not suggest or require the
> recalculation of existing sentences.  Neither *Norman* nor the changes
> to the sentencing guidelines are retroactively applied on collateral
> review.

*United States v. James Brice,* No. SAG-07-0261 (D. Md. May 13, 2021), ECF 386 at 6.  Moreover,

as Judge Gallagher rightly proclaimed: "[s]entencing is, at heart, an individualized inquiry."  *Id.*

*See also United States v. Crandall*, 2020 WL 7080309, at *6 (N.D. Iowa Dec. 3, 2020) (Williams,

J.) (denying motion for compassionate release that was based on the changes to the career offender

guideline, stacking, and application of Armed Career Criminal Act; and explaining that while the

U.S.S.G. policy statement is not binding, "courts should not stray far from the categories explicitly

listed; health, age, and familial circumstances.  Failing to heed those broad categories as guideposts

would turn the compassionate release framework into a mechanism by which a court could simply

reduce any sentence it disagrees with for any reason it concludes is extraordinary without respect

to the Commission's guidance.  In sum, although the Court recognizes that it is not wholly

constrained by Section 1B1.13, it is highly skeptical of expanding the compassionate release

system into, essentially, a discretionary parole system. . . . The Court finds that non-retroactive

changes in the law cannot constitute an extraordinary and compelling reason for compassionate

release."); *United States v. McKinnie*, 2020 WL 5087058, at *3 (N.D. Ohio Aug. 27, 2020) (Boyko,

J.) (applying same reasoning in denying relief based on change in Sixth Circuit law regarding

career offender status; "inquiry under the compassionate release statute must be highly

individualized, and not based on facts or changes in the law that affect hundreds—if not

thousands—of prisoners."); *But see United States v. Adams*, 2020 WL 3639903 (S.D. Ill. July 6,

2020) (Rosenstengel, J.) (sickle cell disease is itself insufficient; career offender sentence is longer

than would be imposed today; "the Court is of the view that the remarkable disparity between

Adams's sentence and a comparable sentence today, as well as Adams's noteworthy progress towards rehabilitation would likely constitute sufficiently extraordinary and compelling reasons to merit a sentence reduction, but not immediate release. Taken in conjunction with the backdrop of the Covid-19 pandemic and Adams's underlying medical condition, however," the court reduces 420-month sentence to time served of 196 months), called into question by J. Thacker); *United States v. Wahid*, 2020 WL 4734409 (N.D. Ohio Aug. 14, 2020) (Gwin, J.) (court grants compassionate release based on the combination of the general risk presented by COVID-19 at Elkton, and the fact that the defendant's sentence would be much lower under current law; he would not be a career offender under current law, and has already served the much lower sentence that would likely be imposed today); *United States v. Derricoatte*, 2020 WL 5629095, at *4 (N.D. Ohio Sept. 21, 2020) (Lioi, J.) (the defendant would not be a career offender today and the sentence would be much lower; "[w]hile this fact alone would not support release, the Court finds that this sentencing disparity, along with the significant and unique changes in defendant's incarceration status since the pandemic, support a compassionate release. In particular, the record demonstrates that while Derricoatte qualifies for participation in the BOP's RDAP, it is unclear whether he will be able to participate in and complete the program in time to earn a reduction in his sentence."); *United States v. Vigneau*, 2020 WL 4345105, at *6 (D.R.I. July 21, 2020) (McConnell, J.) (court reduces 365-month sentence to time served after 23 years, based on the evolution in sentencing law: "it is now proper for the Court to consider the fact that the Guidelines have changed–from mandatory to discretionary–in determining whether to grant compassionate release."); *United States v. Trice*, 2021 WL 402462 (W.D. Va. Feb. 3, 2021) (Conrad, J.) (compassionate release granted because the defendant would not be a career offender under current law and his sentence would be "dramatically lower"); *United States v. Vaughn*, 2021 WL 136172 (S.D.W. Va. Jan. 13,

2021) (Volk, J.) (following *McCoy*, the court grants relief based on the fact that the defendant would not be a career offender today and would receive a much lower sentence).

### D.    The factors set forth in 18 U.S.C. § 3553(a) further support a denial of the requested relief

Mr. Braxton's failure to demonstrate "extraordinary and compelling reasons" means that he is not eligible for a sentence reduction.  Accordingly, the Court's analysis should end there. *See, e.g.*, *United States v. Adkins*, 854 F. App'x 758, 760 (7th Cir. Aug. 5, 2021).  Assuming, *arguendo*, Mr. Braxton could demonstrate his eligibility under § 3582, he nonetheless fails to carry his additional burden of establishing that, contrary to the Court's prior analysis, reducing his sentence as requested is consistent with the applicable sentencing factors under § 3553(a).

On several occasions, the Court has analyzed the 18 U.S.C. § 3553(a) factors to determine a sentence that was sufficient, but not greater than necessary, to comply with the purposes described in § 3553(a)(2).  The first occasion was during the original sentencing hearing on April 1, 2013.  During that hearing, the defense challenged the application of adjustments for the use of a minor and his supervisory, leadership, or aggravated role.  ECF No. 341, at 4-15, 50.  After hearing argument, the Court determined that the adjustment for use of a minor applied and was "richly deserved."  *Id.* at 26.  The Court also found that a two-level adjustment was warranted under U.S.S.G. 3B1.1 for an aggravating role in the conspiracy, stating:

> It is very clear based upon the evidence before this Court, the content of the presentence report, the representations made by the government with respect to the phone calls that have previously been provided to the defense, that he richly deserves the lowest level of aggravated role adjustment of two levels which is what has been recommended.  Arguably, one can say that he should have a higher level than that.

*Id.* at 26-27.  Therefore, the total adjusted offense score was determined to be 35.  *Id.* at 27. Because Mr. Braxton was determined to be a career offender, the applicable criminal history was

Category VI, and the guideline range was found to be 292 to 365 months. *Id.* The defense requested that the Court impose a sentence of not more than 188 months. *Id.* at 40. He argued that the guidelines were excessive, that there was no violence involved, and that the prior drug distribution convictions were not "of the sort of prior convictions I submit to the Court that certainly were intended to justify a career offender guideline offense level and application of a high career offender sentence." *Id.* at 28-33. Much as he does now in the instant motion, the defense raised with the Court a perceived disparity between the potential sentence of a co-defendant, Mr. Holland, who the defense argued was more culpable than Mr. Braxton, and the sentence Mr. Braxton was facing. *Id.* at 36-39. However, unlike Mr. Braxton, Mr. Holland was not a career offender. Mr. Holland was also facing 20 years of "backup time" in another case. *Id.* at 47. The Court also noted that Mr. Holland had a lower offense level and was entering into a c-plea with the Government; he also compared Mr. Braxton's situation with many of the other co-defendants and explained his position relative to the desire for uniformity of sentences. *Id.* at 36-39, 55-56.

Turning to the § 3553(a) factors, the Court, amongst other things, stated that Mr. Braxton was "a defendant whose consistent repetition of criminal behavior after serving prior sentences is alarming. He is an unrepentant recidivist. He has not been deterred by prior sentences and therefore a higher level of deterrence is necessary." *Id.* at 54. The Court then went on to sentence Mr. Braxton to 324 months imprisonment.

On May 15, 2017, the Court considered the § 3553(a) factors when it granted a motion to reduce sentence. ECF No. 493. Mr. Braxton's sentence was reduced pursuant to 18 U.S.C. § 3582(c)(2) based upon retroactive application of Amendment 782 to the Sentencing Guidelines which reduced the applicable offense level by two levels. The resultant new guidelines were 262-

327 months. In requesting a 262-month sentence, the defense pointed out, among other things, that his criminal history consists "solely of low-level drug and driving offenses" and that he does not have a "record of violence." ECF No. 486. The Government consented to relief and requested a sentence of 291 months, which the Court ultimately imposed. ECF No. 492, 493.

On December 7, 2020, this Court yet again considered the § 3553(a) factors when it denied Mr. Braxton's first compassionate release motion based upon the COVID-19 pandemic, and much like the instant motion, perceived sentencing disparities, or errors in applying sentencing factors. ECF No. 598. In denying the motion, this Court stated in relevant part,

> The court has considered the arguments of counsel suggesting that errors in applying sentencing factors were made by the prior judge to whom this case was assigned. Although the time to challenge those findings directly has long since passed, the undersigned has considered those arguments as part of the current 3553(a) analysis. The goals of punishment, deterrence, and protecting the public would not be served by so drastic a sentence reduction[.]

*Id.* at 2.

As of February 24, 2022, Mr. Braxton will have served ten years of the original 27-year sentence. As described, his sentence was first reduced by 33 months and he now asks this Court to weigh the sentencing factors yet again and reduce his sentence by at least 103 months more (resulting in a new overall sentence of not more than 188 months)—even though Mr. Braxton already asked the Court to sentence him to 188 months in the original sentencing. ECF No. 341 at 40 ("what we're asking the Court to do here is this – I don't think this is unreasonable – is to give a sentence in this case say 188 months, which is again I think because the career offender status, drug quantity guidelines are excessive, getting him down to essentially a 32 or 33 or a category 4 or 5 is not unreasonable as reflecting an appropriate sentence in this case"). The analysis of the § 3553(a) factors results in the same conclusion as before, and this Court should again decline to sentence him to 188 months.

In context, it is clear that when the Court referenced Mr. Braxton's extensive criminal history in the original sentencing, it was not focused on the minor offenses like failures to appear or driving infractions. *Id*. at 52-53. Rather, the Court primarily focused on Mr. Braxton's various prior drug related offenses and the length of the sentences that he had already served (as best the Government can tell, the Court's sole reference to Mr. Braxton's contacts with the criminal justice system that did not result in convictions was a single sentence). *Id*. at 53. The Court characterized Mr. Braxton as an "unrepentant recidivist" who had not been deterred by prior sentences. *Id*. at 54.

Mr. Braxton claims that his 291-month sentence is "so far out of step with current sentencing practices today that it exceeds the average term that federal courts impose today for violent crimes" and in support cites a report stating that the average sentence for murder is 255 months. ECF 617 at 17. A comparison of Mr. Braxton's sentence to this statistic is misleading. First, "murder" in the cited report includes first degree murder, second degree murder, and conspiracy or solicitation to commit murder (offenders sentenced under U.S.S.G. §§ 2A1.1, 2A1.2, and 2A1.5). *See* U.S. Sent'g Comm'n, 2019 Sourcebook of Federal Sentencing Statistics, App'x A, page 213. Second, it appears the statistic is an average of all sentences regardless of the defendants' specific criminal histories. Instead, if one were to look more appropriately at all offenders convicted of first-degree murder (§ 2A1.1) from 2015 to 2020 (164 cases) with a criminal history category of IV (the same as Mr. Braxton), the result is that the average sentence is, of course, much higher than 255 months—at 329 months. *See* U.S. Sent'g Comm'n Interactive Data Analyzer, available at, http://ida.ussc.gov. Regardless, at bottom, cherry-picking statistics, especially an average, fails to properly account for the individualized assessment of the myriad factors that go into arriving at an appropriate sentence—here, as just one example of a factor, the

use of a minor in furtherance of the crime, that the Court characterized as "egregious." ECF No. 341 at 26.

The Government agrees that Mr. Braxton has availed himself of rehabilitative services while incarcerated and, other than some minor infractions, comported himself well. However, this progress, while encouraging, does not sufficiently offset all of the other factors under § 3553(a). A sentence of 188 months would result in a sentence lower than some of his co-defendants, despite playing an aggravating role in the conspiracy and using a minor to carry out some of his criminal acts.

The factors set forth in 18 U.S.C. § 3553(a) and policy statement U.S.S.G. § 1B1.13 still weigh against the Court granting a compassionate release. Therefore, this Court should again decline to modify Mr. Braxton's sentence.

## Conclusion

The Government respectfully requests that the Court deny the Petitioner's motion for a sentence reduction.

Respectfully submitted,

Erek L. Barron
United States Attorney

*G. Michael Morgan, Jr.*

Digitally signed by GARY MORGAN
Date: 2021.11.22 20:04:12 -05'00'

G. Michael Morgan, Jr.
Assistant United States Attorney

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on November 22, 2021, a copy of the foregoing Response and

Draft Order was delivered via ECF to Sapna Mirchandani, Esq. counsel for the Petitioner.

Digitally signed by GARY
MORGAN
Date: 2021.11.22 20:04:41 -05'00'

G. Michael Morgan, Jr.
Assistant United States Attorney